IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| DELTA-T CORPORATION, | |
| Plaintiff, | |
| v. | Civil Action Number 3:08CV524 |
| PACIFIC ETHANOL, INC., ET AL., | |
| Defendants. | |

## **MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants's Motion to Dismiss for Lack of Personal Jurisdiction, or in the Alternative Motion to Stay (Doc. No. 4). On August 18, 2008, Plaintiff Delta-T Corporation filed a six-count complaint against Pacific Ethanol, Inc. ("PEI"), Pacific Ethanol Stockton, LLC ("PE Stockton"), Pacific Ethanol Imperial, LLC ("PE Imperial"), Pacific Ethanol Columbia, LLC ("PE Columbia"), Pacific Ethanol Magic Valley, LLC ("PE Magic Valley"), and Pacific Ethanol Madera, LLC[1] ("PE Madera"), alleging that Defendants's failure to make contractual payments amounted to a breach of the parties's licensing agreements, term sheet, and supplemental letter agreement. In response, Defendants filed the instant Motion.

For the reasons below, this Court DENIES Defendants's 12(b)(2) Motion to Dismiss, as jurisdiction is proper over all defendants. Further, Defendants's Alternate Motion to Dismiss and Compel Arbitration is GRANTED; Plaintiff is hereby ORDERED

---

[1] Pacific Ethanol Madera, LLC was incorrectly named "Pacific Ethanol Madera, Incorporated" in Plaintiff's Complaint. (Def.'s Mem. in Support of Mot. to Dismiss 1.)

1

to submit their claims to arbitration pursuant to the terms of Article 18.1 and 18.2 of the parties's EPT Agreements.

## I. BACKGROUND

Delta-T Corporation ("Delta-T") is an ethanol technology firm headquartered in Williamsburg, Virginia. As a technology firm, Delta-T provides a variety of services to clients in the ethanol industry, including licensing of proprietary technology, process design, process modeling and simulation, engineering, and plant start-up assistance. Pacific Ethanol, Inc. ("PEI") is an ethanol manufacturer and operates four bio-refineries in California, Idaho, and Oregon. Each bio-refinery (ethanol plant) is owned and operated by an independent subsidiary of PEI.[1] Each subsidiary is a named Defendant in this case. All the Defendants are Delaware corporations headquartered in California.

In 2005, Neil Kohler, Chief Executive Officer of PEI, contacted Bibb Swain, Delta-T's President and CEO, to obtain the company's services in construction of a fuel ethanol plant in Madera, California. (Pl's Mem. in Opp. to Def.'s Mot. to Dismiss 1, Ex.2 ¶ 4.) Mr. Kohler contacted Delta-T on behalf of PE Madera, the owner of the Madera Plant; this contact was received by Mr. Swain in Williamsburg, Virginia. (Pl's Mem. in Opp. to Def.'s Mot. to Dismiss, Ex. 2 ¶ 4.)

In September 2005, Delta-T and PE Madera entered into a license agreement for the construction of the Madera Plant. In November of the same year, PE Madera awarded the general construction contract to W.M. Lyles Co., who then entered into an

---

[1] Specifically, PE Stockton owns a plant in Stockton, CA; PE Imperial owns a suspended plant in Calipatria, CA; PE Columbia owns a plant in Boardman, OR; PE Magic Valley owns a plant in Burley, ID; and PE Madera owns a plant in Madera, CA. (Def.'s Mem. in Support of Mot. to Dismiss 2.)

engineering subcontract with Delta-T. Negotiations leading to these agreements included several face-to-face meetings in Fresno and Madera, California. Representatives of Delta-T, PEI, and W.M. Lyles, Co., were in attendance.

In December 2005, PEI and Delta-T entered into an Engineering, Procurement and Technology License Agreement ("EPT Agreement") for the Madera Plant. Subsequently, Defendants and Delta-T entered into four more EPT Agreements for the remaining four ethanol plants.[2] The EPT Agreements were entered into after "extensive telephone and e-mail negotiations, and the exchange of draft agreements between the parties and their counsel." (Def.'s Mem. in Support of Mot. to Dismiss 3.) During these exchanges, Delta-T representatives were in Virginia. No face-to-face meetings were held in Virginia in connection with the negotiation of the four EPT Agreements.

Under the EPT Agreements, Delta-T was to perform engineering and procurement services to support the construction and startup of the five Pacific Ethanol plants. Defendants would deliver "documents, drawings, equipment, specifications," and other agreed upon information to Delta-T at their Virginia office. (EPT Agreement ¶ 3.1) Further, Defendants retained the right to review the design and detailed engineering documents. All payments under the EPT Agreements were to be sent or wired to Delta-T in Virginia. In addition, the EPT Agreements contained a dispute resolution clause which provided that any controversy or claim arising out of the agreements or their interpretation, termination, or breach, would be resolved per the

---

[2] The remaining four ethanol plants were to be located in Boardman, Oregon ("Oregon Plant"); Stockton, California ("Stockton Plant"); Brawley, California ("Brawley Plant"); and Burley, Idaho ("Idaho Plant").

terms of the contract.  Specifically, Article 18.1 of the EPT Agreements states, in pertinent part:

> [T]he Party involved shall, upon the written request of the other, attempt to resolve the matter by agreement of the representatives of the Parties at least one management level above the individuals who have had direct responsibility for performance of the Contract, or the highest level of management of any Party whose highest level of management has had direct responsibility for such performance.  Such representatives shall meet in person or by telephone or teleconference at least once, and shall attempt to resolve any matter raised by either of them by the written notice requesting such resolution for a period of at least forty-five (45) days.  **If the Parties are unable to resolve the dispute by agreement of such representatives within such 45-day period, then at the written request of any Party they shall submit the matter to binding arbitration under the then current Construction Industry rules of American Arbitration Association**.

(Def.'s Mem. in Support of Mot. to Dismiss 3.)

Plaintiff Delta-T claims that in December 2007 it became clear that PEI and its affiliates were unable to make the required payments under the EPT Agreements.  To discuss the status of payments, Delta-T's representatives visited Defendants's offices in California.  (Def.'s Mem. in Support of Mot. to Dismiss, ex. A ¶ 6.)  Defendants, in turn, visited Delta-T's Virginia office on January 31–February 1, 2008 "to reconcile Delta-T's invoices and billing records with PEI's records."[3]  (Id. at ¶ 7; Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss 4.)  PEI and its affiliates agreed to modifications to the EPT Agreements, which were spelled out in a negotiated Term Sheet on February 13, 2008, and ultimately included in a binding Letter Agreement on April 24, 2008.  (Pl's Mem. in

---

[3] Representatives of the Defendants visited Delta-T's offices in Virginia twice.  This 2008 visit was the second visit.  The first visit was after Delta-T was awarded the Madera contract from W.M. Lyles, Co., and was for the purpose of expressing dissatisfaction with the pace of Delta-T's engineering services.  (Def.'s Mem. in Support of Mot. to Dismiss 4.)  The Defendants contend that these two visits are the only connection they have to Virginia, and as such jurisdiction is not proper.

Opp. to Def.'s Mot. to Dismiss 4.) The Letter Agreement modified provisions of the EPT Agreements, including payments, security of payments, and the manner in which disputes would be resolved. The Letter Agreement was signed by Delta-T, PEI, PE Stockton, and PE Imperial.

Following the execution of the Letter Agreement, Plaintiff contends that Defendants failed to make required payments. Notice of the missing payments was given to Defendants on May 16 and May 23, 2008. On August 18th, Delta-T filed the entitled action alleging that non-payment of funds amounts to a breach of the parties's EPT Agreements, Term Sheet, and Letter Agreement. Defendants now move this Court to dismiss Plaintiff's action for lack of jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2), or in the alternative, to dismiss or stay the action and compel Plaintiff to submit to arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. § 3.

## II. PERSONAL JURISDICTION

In a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, Plaintiff bears the burden of establishing personal jurisdiction over defendants by a preponderance of the evidence. Mylan Labs., Inc. v. Akzo, 2 F.3d 56, 59–60 (4th Cir. 1993). Plaintiff is given the benefit of "favorable inferences" from any pleadings, affidavits, and documents submitted on the issue, and the "most favorable inferences" must be drawn in favor of jurisdiction. Reynolds Metals Co. v. FMALI, Inc., 862 F. Supp. 1496, 1498 (E.D. Va. 1994); Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989).

To determine whether jurisdiction is proper, the court must make a two-part inquiry. Peanut Corp. of Am. v. Hollywood Brands, Inc., 696 F.2d 311, 313 (4th Cir. 1982). First, the court determines whether the Virginia long-arm statute provides

jurisdiction. Id. Second, the Court determines whether the exercise of jurisdiction would comport with due process. Id.

The applicable section of Virginia's long-arm statute extends jurisdiction "to the extent permissible under the due process clause." Va. Code Ann. § 8.01-328.1(A)(1); English & Smith v. Metzger, 901 F.2d 36, 38 (4th Cir. 1990). For that reason, the jurisdictional two-part statutory and constitutional inquires are interrelated. While interrelated, this Circuit has not abolished the long-arm analysis; rather, the Fourth Circuit has insisted that contacts that satisfy due process will not necessarily meet Virginia's statutory requirements. Guthrie v. Flanagan, 2007 U.S. Dist. LEXIS 86987, *6 (E.D. Va. Nov. 27, 2007) (citing New Wellington Financial Corp. v. Flagship Resort Development Corp., 416 F.3d 290, 294–95 n. 6 (4th Cir. 2005)). As such, a specific provision of the long-arm statute must be pled.

In the present matter, Plaintiff claims jurisdiction is proper under Va. Code. 8.01-328.1(A)(1), which allows jurisdiction over out-of-state defendants who transact business within the Commonwealth. Plaintiff further contends that this court's exercise of jurisdiction comports with constitutional due process standards. Defendants disagree.

### A. Virginia's Long-Arm Statute

Virginia's long-arm statute grants the court authority to exercise personal jurisdiction over nonresidents who directly, or through an agent, transact any business within the Commonwealth, so long as the cause of action arises from the non-resident's transaction of business. Va. Code § 8.01-328.1(A)(1); Peanut Corp. of Am., 696 F.2d at 313–14. This statute extends jurisdiction "to the extent permissible under the due

process clause." English & Smith, 901 F.2d at 38; Kolbe, Inc. v. Chromodern Chair Co., Inc., 211 Va. 736, 740 (1971) ("It is manifest that the purpose of Virginia's long arm statute is to assert jurisdiction over nonresidents who engage in some purposeful activity in this State to the extent permissible under the due process clause.").

It is well established that even one act of transacting business will suffice. English & Smith, 901 F.2d at 38; D'Addario v. Geller, 264 F. Supp. 2d 367, 379 (E.D. Va. 2003) (noting that Virginia is a single act state and therefore a single act of transacting business can give rise to a cause of action). In assessing whether a defendant has "transacted business" in the forum, courts consider: (1) where any contracting occurred, and where the negotiations took place, (2) who initiated the contact, (3) the extent of the communications, both telephonic and written, between the parties, and (4) where the obligations of the parties under the contract were to be performed. Affinity Memory & Micro v. K & Q Enterprises, 20 F. Supp. 2d 948, 952 (E.D. Va. 1998).

Correct application of the long-arm statute requires a factual analysis of the defendant's business activity in the forum. In this way, the defendant ultimately determines whether jurisdiction is permissible. In Peanut Corp of Am., the Fourth Circuit held that a letter received and signed by a buyer in Virginia that became part of the parties's contract, telephonic negotiations received in Virginia, and numerous communications sent to and received in Virginia were enough to constitute "transacting business." 696 F.2d at 314. Additionally, the Fourth Circuit in English & Smith, found personal jurisdiction over a California attorney because the California attorney initiated the relationship with the Virginia attorney knowing the attorney would do the work in Virginia, the relationship was contracted over the phone and by a follow-up letter

executed in Virginia, the duties were performed in Virginia, and there were numerous telephone calls and written communications between the parties. 901 F.2d at 36—40. The present case is similar to both Peanut Corp. of Am., and English & Smith.

In the present case, all of the defendants have directed their activity towards Virginia in an effort to transact business with Delta-T, a Virginia company located in Williamsburg, Virginia. Specifically, representatives of PEI initiated contacted with Delta-T in Virginia to obtain the company's services in connection with the development of an ethanol plant in Madera, California; negotiated with Delta-T regarding the terms of the Madera Plant's EPT Agreement, with work under the Agreement to be performed in Virginia; participated in telephone and email negations with Delta-T representatives regarding the terms of four subsequent EPT Agreements, these negotiations took place while Delta-T was in Virginia; signed a Letter Agreement with the Plaintiff that was negotiated, in part, during a face-to-face meeting in Virginia; and bound itself, under the signed EPT Agreements, to continually deliver "documents, drawings, and specifications" to Delta-T in Virginia. These activities are sufficient to show that PEI transacted business in Virginia.

Further, following PEI's contact with Delta-T to solicit the Plaintiff's services on the Madera Plant, wherein PEI served in its own capacity and as PE Madera's agent, PE Madera entered into a license agreement with Delta-T under which Delta-T would provide services in Virginia directed toward the ethanol plant in Madera, California. The actions of PE Madera's agent, and PE Madera's own entrance into a licensing contract with Delta-T wherein payments were to be made, and services rendered, in Virginia, constitute transacting business within the Commonwealth.

Moreover, during PEI's subsequent negotiations of the terms of the Madera Plant's Engineering, Procurement, and Technology Agreement ("EPT Agreement"), which, according to the EPT Agreement itself, was to serve as a "template for the execution of future projects utilizing Delta-T's services," PEI served as an agent of its subsidiaries PE Madera, PE Stockton, PE Columbia, PE Magic Valley, and PE Imperial. Each Defendant subsidiary later ratified the contract by signing their plant's respective EPT Agreement. Under the terms of these Agreements, the Defendants obligated themselves to wire or send payment to Delta-T in Virginia, deliver pertinent documents to Delta-T, who at all times was located in Virginia, and oversee and review the design and detailed engineering documents produced by Delta-T in Virginia. These activities of PEI's subsidiaries also meet the standard of transacting business, directly or through an agent, within the Commonwealth.

Finally, PEI, PE Stockton, and PE Imperial signed a subsequent Letter Agreement with Delta-T purporting to resolve payment disputes related to the Defendants and their respective EPT Agreements, with payments under the Letter Agreement to be delivered to Delta-T in Virginia. (Letter Agreement 1 (stating that the Letter Agreement was intended to be a binding agreement between Delta-T, PEI, "and certain limited liability companies (the Project LLC's), all of whom are subsidiaries of PEI, [which] have agreed and desire to be bound regarding this Letter Agreement and the . . . EPT Agreements between [Delta-T] and the respective Project LLCs. The Project LLCs are" PE Magic Valley, PE Stockton, PE Imperial, and PE Columbia).) PE Madera is not a signator or named party to the Letter Agreement. These further activities constitute transacting business in the Commonwealth. Moreover, all of Plaintiff's claims

arise out of Defendants's contracts with Delta-T to provide services in the construction of the five Pacific Ethanol plants.

## B. Due Process

Due process requires that non-resident defendants have certain minimum contacts with the forum state such that the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice." Calder v. Jones, 465 U.S. 783, 788 (1984). To establish minimum contacts, the contacts must be such that the non-resident defendant "purposefully availed" itself of the privilege of the laws of the forum, so as to ensure that the non-resident defendant has warning that their activities may subject them to litigation within the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985). Depending on the contacts, jurisdiction may be proper based on general or specific jurisdiction.

General jurisdiction exists where a defendant's activities in the forum state are "continuous and systemic." Saudi v. Northrop Grumman Corp., 427 F.3d 271, 276 (4th Cir. 2005) (noting that "[t]he threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than [that required] for specific jurisdiction). Specific jurisdiction may be found where a foreign defendant has fewer contacts with the forum state than under general jurisdiction, but the plaintiff's cause of action arises out of or results from those contacts. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984). Plaintiff's place of business or residence is not the determinative factor in deciding jurisdiction. ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 626 (4th Cir. 1997). Rather, the plaintiff's place of business must be

accompanied by Defendant's own contact with the state.  Id.  Further, the contacts sufficient to confer jurisdiction must not be too attenuated.  Id.

To determine specific jurisdiction, the Court must analyze "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable."  Mitrano v. Hawes, 377 F.3d 402, 407 (4th Cir. 2004) (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002)).

The touchstone of the minimum contacts analysis is whether an out-of-state person engaged in some activity purposefully directed toward the forum state.  While the parties's agreement on the applicable law and venue is a factor in determining whether a non-resident defendant has purposefully availed itself of the forum state's law, the substance of that contact must also be weighed.  See, e.g. Burger King Corp., 471 U.S. at 481–82 (reversing the appellate court's decision that jurisdiction was proper due, in part, to the insufficient weight the appellate court gave to the parties's choice-of-law provision); Command-Aire Corp.  v. Ontario Mechanical Sales and Service, Inc., 963 F.2d 90, 94 (5th Cir. 1992) ("[T]he place where the contract is to be performed . . . is a weighty consideration.")

When examining a defendant's contacts to determine whether their activities were purposefully directed towards residents of the forum state, courts must consider who benefitted from the contacts, who initiated them and why, whether the contacts involved any person's physical presence in the state, and what further conduct in the forum state was contemplated by the parties.  Raymond, Colesar, Glaspy & Huss, P.C. v.

Allied Capital Corp., 761 F. Supp. 423, 426 (E.D. Va. 1991) (Spencer, J.). Where a defendant deliberately engages in significant activities within a state, or has created continuing obligations between himself and residents of that state, jurisdiction is reasonable because the defendants have manifestly availed themselves of the privilege of conducting business within that jurisdiction. Burger King, 471 U.S. at 471-76.

      Here, the Defendants's contacts with the Commonwealth, as outlined in detail above, satisfy the constitutional due process standard. Defendants, personally and through their agent, purposefully directed activity towards the forum to obtain Plaintiff's services in relation to the five Pacific Ethanol plants. These numerous contacts include, but are not limited to, Defendants entering into contracts which required Delta-T to perform engineering and other technology services in Virginia; obligating themselves, under the contracts, to make payments and deliver documents to Delta-T in Virginia; and reserving the right to review Delta-T's design and detailed design components which were created in Virginia. The Defendants undertook these obligations for each of the five Pacific Ethanol plants. Further, the defendants benefitted from these activities, which were directed at the forum. However, despite these numerous contacts, Defendants insist that their only contact with Virginia is the fact that Plaintiff resides in the Commonwealth and, moreover, that the parties's choice-of-law provision and forum-selection clause[4] proves that Defendants did not

---

[4] Defendant repeatedly states that they have a forum selection clause that directs the Plaintiff's claim to be brought in Los Angeles, California; however, the parties forum selection clause only pertains to matters arising under the arbitration agreement and does not purport to dictate that a legal action, if one is so warranted, can only be brought in Los Angeles. (See EPT Agreement ¶ 18.2 ("The place of arbitration shall be agreed in writing between the parties, or in the absence of agreement, shall be Los

purposefully avail themselves of the forum state. Defendants's arguments are not persuasive.

As noted above, Defendants's numerous contacts with Virginia are not based solely on Plaintiff's residence in the forum, but Defendants's purposeful acts of transacting business and creating continuing business obligations in the state . Additionally, while the parties choice-of-law provision should be, and has been, considered in determining whether the Defendants purposefully availed themselves of the forum state, the Defendants's choice-of-law and forum selection clause cannot eviscerate their numerous, purposeful activities directed towards the forum. Moreover, the present claims arise out of Defendants's contacts with the forum. Lastly, it is constitutionally reasonable to subject Defendants to jurisdiction in Virginia because they were given fair warning that they could be subjected to a lawsuit in the Commonwealth as a result of their soliciting services with a Virginia company, they purposefully availed themselves of the forum states's laws by their presence in the state to resolve contractual disputes related to the hiring of Delta-T, and they created a continuing obligation with the Plaintiff in relation to the underlying contracts, which are the focus of this action. Accordingly, personal jurisdiction over PEI, PE Madera, PE Stockton, PE Imperial, PE Magic Valley, and PE Columbia is proper, and Defendants's Motion to Dismiss for lack of jurisdiction shall be DENIED.

### III.  BINDING ARBITRATION

---

Angeles, California.").)

The Federal Arbitration Act, 9 U.S.C. § 1 et seq., requires a court to enforce "a wide range of written arbitration agreements." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 111 (2001); see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983) (declaring that the FAA reflects a policy "favoring arbitration agreements"). The FAA provides that an agreement to arbitrate a dispute arising from a transaction involving commerce is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

A party may compel arbitration under the FAA if it shows that: (1) a dispute exists between the parties; (2) the parties formed a written agreement to arbitrate that "purports to cover the dispute;" (3) the transaction "evidenced by the agreement" is related to interstate or foreign commerce; and (4) that the other party failed, neglected, or refused to arbitrate the dispute. Adkins v. Labor Ready, Inc., 303 F.3d 496, 500–01 (4th Cir. 2002); see Republic Bank & Trust Co. v. Kucan, 245 F. App'x 308, 312 n.1 (2007) (stating that a party "aggrieved" by another party's failure to comply with an arbitration agreement may seek an order compelling arbitration). A court may dismiss or stay a suit that is governed by the FAA. 9 U.S.C. § 3; Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709–10 (4th Cir. 2001) (noting that a court may dismiss a suit if all of the claims in it must be arbitrated). As a matter of federal law, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hosp. v. Mercury Constr. Co., 460 U.S. 1, 24–25 (1983). Therefore, a party should be compelled to arbitrate "unless it may be said with positive assurance that the

arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960).

In the present matter, Defendants Motion to Stay, or in the Alternative, Dismiss, is based on the applicability of the parties's arbitration clause. Each EPT Agreement contains the following clause:

> 18.1 Executive Conference or Arbitration: In the event of **any controversy or claim arising out of or related to this Contract** (excluding any claims related to ownership and/or use rights of intellectual property, including any claim that either party is infringing upon, or mis-using, any intellectual property or proprietary information of the other party), **or the interpretation, termination, or breach hereof**, the Party involved shall, upon the written request of the other, attempt to resolve the matter by agreement of the representatives of the Parties at least one management level above the individuals who have had direct responsibility for performance of the Contract, or the highest level of management of any Party whose highest level of management has had direct responsibility for such performance. Such representatives shall meet in person or by telephone or teleconference at least once, and shall attempt to resolve any matter raised by either of them by the written notice requesting such resolution for a period of at least forty-five (45) days. If the Parties are unable to resolve the dispute by agreement of such representatives within such 45-day period, **then at the written request of any Party they shall submit the matter to binding arbitration under the then current Construction Industry rules of American Arbitration Association**.

Neither party challenges the meaning of this clause, but only whether Plaintiff's claims arise under subsequent agreements (i.e. the Term Sheet or Letter Agreement), and whether the terms of those subsequent agreements modify this provision. Specifically, Plaintiff alleges the Letter Agreement relates to each claim under the Complaint and,

according to Paragraph 4 of the Letter Agreement,[5] Plaintiff may bring the entitled legal action against Defendants.

Defendants rebut Plaintiff's contentions and state that the parties's dispute should be resolved under the arbitration clause of the EPT Agreements. Moreover, Defendants state that the parties Letter Agreement does not change the parties's obligation to arbitrate under the EPT Agreements in that the Letter Agreement's clause purportedly forbearing arbitration is vague, the purpose of the Letter Agreement's provision regarding dispute resolution was only intended to shorten the number of days required before arbitration may commence, the Plaintiff's claim fundamentally arises under the EPT Agreement, not the Letter Agreement, and finally, that even if a lawsuit is proper for some of the claims under the Letter Agreement, all claims are bound by the EPT Agreement and therefore the resulting piecemeal litigation dictates that the arbitration clause be broadly read and this case stayed, or in the alternative, dismissed. This Court agrees, in part.

Plaintiff has made the following claims against Defendants:

**Count I: Breach of Contract (Plant #3)** – alleges Defendants's failure to pay amounts due under the EPT Agreement related to Plant #3 is a breach of contract. (Compl. ¶¶ 42—46.)

---

[5] Paragraph 4 of the Letter Agreement states, in pertinent part: "By signing this Letter Agreement, the Parties agree to refrain from taking any legal action against the other, so long as the Parties are not in breach of any provision of this Letter Agreement. In the event of any controversy or claim arising out of or related to this Letter Agreement, or the interpretation, termination or breach hereof, the Parties shall, upon the written request of either of them, attempt to resolve the matter by agreement of the representatives of the Parties at least one management level above the individuals who have had direct responsibility for such performance. . . . **If the Parties are unable to resolve the dispute by agreement of such representatives with such 5-day period, then the matter may be resolved through legal action**."

> **Count II: Breach of Contract (Plant #4)** – alleges Defendants's failure to pay amounts due under the EPT Agreement related to Plant #4 is a breach of contract. (Compl. ¶¶ 47—51.)
>
> **Count III: Breach of Contract (Procurement Fee)** – alleges Defendants's failure to pay amounts "with respect to each Plant which is properly due under the terms of each respective EPT Agreements" is a breach of contract. (Compl. ¶¶ 52—55.)
>
> **Count III [sic]**:[6] **Indemnity** – alleges Defendants's failure to reimburse Plaintiff for costs associated with third-party claims is a breach of contract; failure is based on indemnity agreement that was verbally and contractually promised by Defendants to indemnify Delta-T for costs incurred related to Defendants failure to pay as required under the EPT Agreements, and under obligations PEI made in an effort to resolve any dispute by the parties. (Compl. ¶¶ 56—61.)
>
> **Count IV: Breach of Term Sheet/Oral Contract/Implied Agreement** – alleges Defendants failed to follow through with a negotiated agreement concerning how to resolve existing payment disputes between the parties under the EPT Agreements, which is a breach of the parties agreement. (Compl. ¶¶ 62—72.)
>
> **Count V: Breach of Letter Agreement** – alleges Defendants failure to follow through with the parties Letter Agreement, which attempts to resolve the ongoing payment dispute under the EPT Agreements, is a breach of contract. (Compl. ¶¶ 73—84.)

This Court holds that each of Plaintiff's claims arise under the EPT Agreement, and therefore the arbitration clause is applicable. Specifically, the substance of Plaintiff's allegations in Counts I, II, III, and III [sic] arise out of the Defendants's failure to make payments as originally required "under" or "with respect to" the EPT Agreements. As such, the arbitration provision of the EPT Agreement is applicable and Defendants's Motion to Dismiss is **GRANTED** as to Counts I, II, III, and III [sic].

---

[6] Plaintiff incorrectly numbered their claims, there are two counts identified as "Count III."

17

Moreover, breach of the parties Term Sheet, as alleged in Count IV, clearly arises "out of or is related to" the EPT Agreements, as required to trigger the parties's arbitration clause. As Plaintiff's note in their Response to Defendants's Motion to Dismiss, the Term Sheet was negotiated to "resolve problems that arose out of the breach of the EPT Agreements." (Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss 4.) Therefore, this Court holds that Defendants's Motion to Dismiss as it relates to Count IV is **GRANTED**.

Plaintiff's final count alleges breach of the parties's Letter Agreement. The Letter Agreement, similar to the Term Sheet, was an attempt to remedy the parties's dispute concerning payments under the EPT Agreements. While this Letter Agreement further attempts to modify the dispute resolution procedure dictated under the EPT Agreements, the Defendants are correct in stating that the substance of the claim arises out of and is related to the EPT Agreements, and therefore the arbitration clause applies. Accordingly, Defendants's Motion to Dismiss as it relates to Count V is **GRANTED**.

Further, in keeping with the Federal Arbitration Act, this Court holds that the Defendants have demonstrated that a binding and valid agreement to arbitrate Plaintiff's claims exist, the agreement is related to interstate commerce, a dispute arising under the agreement exists, and Plaintiff has failed to arbitrate the dispute. As such, Plaintiff is ORDERED to submit their claims to arbitration pursuant to the terms of Article 18.1 and 18.2 of the parties's EPT Agreements.

## III. CONCLUSION

For the reasons stated above, Defendants's 12(b)(2) Motion to Dismiss is DENIED, and Defendant's Motion to DISMISS and Compel Arbitration is GRANTED.

It is SO ORDERED.

> _____/s/_____
> James R. Spencer
> Chief United States District Judge

ENTERED this  7th   day of January 2009